IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| STANLEY BRADFORD CLARKE, | ) | No. CV-F-07-888 OWW/SMS |
| | ) | |
| | ) | MEMORANDUM DECISION AND |
| | ) | ORDER GRANTING IN PART WITH |
| Plaintiff, | ) | PREJUDICE AND DENYING IN |
| | ) | PART DEFENDANTS' MOTION TO |
| vs. | ) | DISMISS FIFTH AMENDED |
| | ) | COMPLAINT AND DENYING |
| | ) | DEFENDANTS' MOTION TO STRIKE |
| SANDRA UPTON, AMPARO | ) | (Doc. 46) AND GRANTING |
| WILLIAMS, DEPARTMENT OF | ) | PLAINTIFF'S MOTION FOR LEAVE |
| SOCIAL SERVICES, AND COUNTY | ) | TO FILE SIXTH AMENDED |
| OF MADERA, | ) | COMPLAINT (Doc. 62) |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Before the Court is Defendants' motion to dismiss Plaintiff's Fifth Amended Complaint and motion to strike and Plaintiff's motion for leave to file a Sixth Amended Complaint.

A. **BACKGROUND**.

Plaintiff commenced this action proceeding *in pro per.* By Memorandum Decision and Order filed on May 9, 2008 (hereafter referred to as the May 9 Decision), Plaintiff was given leave to file a Fifth Amended Complaint. Plaintiff, now represented by

counsel David L. Rowell, timely filed a Fifth Amended Complaint.

The Fifth Amended Complaint is against Sandra Upton and Amparo Williams, alleged to be agents of the County of Madera and employed as social workers with the Madera County Department of Social Services; the Madera County Department of Social Services, and the County of Madera.  The Fifth Amended Complaint alleges:

> 10. On or about November 13, 2004, plaintiff picked up his minor son A from his mother Elizabeth Curutchague. Plaintiff observed signs and indicia of physical and or sexual abuse upon plaintiff's minor son. Plaintiff sought medical attention for his minor son"s injuries from the child's pediatrician Dr. Richard Jones. Dr. Jones documented the injuries and circumstances surrounding the injuries and made a suspected child abuse report to the Fresno and Madera County Department of Social Services, Child Protective Services.

> 11. On or about the month of November 2004, the California Child Psychological Institute located in Fresno California, filed a written suspected child abuse report with the Fresno and Madera County Departments of Social Services concerning incidences of child abuse of plaintiff's minor child.

> 12. On or about November 19, 2004, Defendants Madera County Department of Social Services Child Protective Services caused to be issued an Emergency Protective Order protecting the minor child A from his mother, and placing the minor in plaintiff's custody.

> 13. On or about November 24, 2004, the Kern County Superior Court held a hearing to determine the placement of the minor child A. Madera County Department of Social Services Child Protective Services sent a social worker to the Kern County Superior Court hearing. The social worker informed the Superior Court Judge Hoover that the Department of Social Services would initiate a Welfare and Institutions Code section 300

2

petition if the Judge returned the minor child A to the custody or visitation of his mother Curutchague. The Superior Court Judge ordered supervised visitation for the mother Curutchague and that she would not sleep in the same bed as the minor. The Superior Court Judge Hoover ordered a forensic sexual and physical abuse examination by Dr. Jay Edward Fisher PhD.

14. On or about January 3, 2005, during a scheduled visit to the minor child's pediatrician, Dr. Jones found signs of physical abuse and injuries on the minor child's body which the minor child related that his mother Curutchague had inflicted when hitting him with a wooden spoon. It was also reported on or about this time that Curutchague was still continuing to sleep in the same bed as the minor A in violation of the Kern County Court order.

15. On or about January 6, 2005, Madera County Department of Social Services Child Protective Services instructed plaintiff to not return his minor son A to his mother Curutchague on January 8, 2005, for custody exchange, due to new and ongoing incidences of child abuse, and instead instructed plaintiff to bring his minor son A into the Department Building located at 629 E. Yosemite Avenue, in Madera California on Monday, January 10, 2005. Defendants instructed plaintiff that they did not want the minor child returned to the mother"s custody. Defendants instructed plaintiff that plaintiff's minor child would be returned to plaintiff the following week, during plaintiff's scheduled custodial time. Plaintiff relied upon and complied with the Defendant's commands and instructions, for fear of loss or injury to his child.

16. On or about January 10, 2005, plaintiff and plaintiff's minor child arrived at defendants building. Plaintiff asked defendants if he would in fact get his minor son back as promised because of the horror stories plaintiff had heard about children taken away and then caught in the system. Defendants assured plaintiff he would get his

3

minor son back as soon as possible and then coerced plaintiff to believe the need for relinquishing his minor son by informing plaintiff that they could not help the minor child unless he was turned over to their custody. Defendants then promised that the minor child A would be temporarily protected and then returned to plaintiff within a few days after the appropriate paperwork was filed with the court. Plaintiff relied upon and complied with the Defendants commands and instructions, for fear of loss or injury to his child. Defendants Madera County Department of Social Services Child Protective Services then removed plaintiff's minor son from his presence. This was the last day that plaintiff had physical or legal custody of his minor son for over two and a half years.

17. On or about January 10, 2005, Plaintiff"s minor child A was placed in a foster care home and then, subsequently moved to at least three different foster homes due to pelvic thrusting and sexually acting out. Plaintiff's minor son A was detained in foster care for five (5) full months until June 14, 2005. Plaintiff father and the minor's mother were both allowed only 1 to 2 hour supervised visits per week with their minor child A. This was not in the minor child's best interest. Defendants did not allow plaintiff any phone contact with his minor son or offsite visits, but the minor"s mother, the child abuse suspect, was allowed phone contact and offsite visits. This was shocking, causing much emotional distress and grief to plaintiff. It was also extremely emotionally distressful to watch plaintiff's minor son suffer from separation anxiety, fear, abandonment, and a need to be reunited with his parents. Plaintiff was powerless to help his minor son who was in state custody and control, and continued to be detained in state custody and control as a dependant ward of the juvenile court for 33 months from January 10, 2005, until September 18, 2007.

18. Defendants Madera County Department of Social Services Child Protective Services did not conduct a dependency hearing within the

4

mandated statutory time pursuant to California Code law, including but not limited to, the Welfare and Institutions Code. Defendants postponed, and or allowed the postponement of the dependency hearings beyond the statutory 10 day period without cause. Defendants did not return plaintiff's minor child to plaintiff within the mandated statutory time or within the time they had promised plaintiff. Defendants did not notify plaintiff that his minor child was being moved to different foster homes, nor did they allow the placement of plaintiff's minor child with extended family or relatives, which would have been less traumatic and helped to minimize and or mitigate emotional distress and suffering to the minor and to plaintiff.

19. On or about January 24, 2005, defendants Madera County Department of Social Services Child Protective Services conducted and tape recorded a Child Sexual Assault Response Team CSART interview of plaintiff"s minor son A, consisting of at least five team panel members, including the Madera City Police Department, and the Madera County District Attorney's Office. The CSART was conducted without plaintiff or any relative present for the benefit of the minor child who was only three years of age. Department social workers informed plaintiff that the team panel was unanimous in determining that plaintiff's minor son A was a credible witness and that they believed that he had been physically and sexually abused by his mother Elizabeth Marie Curutchague. Considering that information and the signs of physical abuse on the minor child's body, the Madera County Department of Social Services Child Protective Services placed Elizabeth Curutchague's name on the Department of Justice Child Abuse Index.

20. On or about January 24, 2005, based on the results of the CSART interview, plaintiff asked defendants Madera County Department of Social Services Child Protective Services to return his child to his custody, as plaintiff was not the offending parent and had not been accused of any harm toward his minor son. Plaintiff had a suitable home and employment

5

to care for his minor son, and in fact had cared for his minor son since his birth, which had not been put into question. Plaintiff was instructed that defendants could not return plaintiff's minor son to his custody. Defendants cited no circumstances that would prevent the minor child to be returned to plaintiff. Defendants claimed that they had to wait until the hearing to determine dependency. Defendants caused the postponement, or allowed the postponement of the dependency hearings for an unreasonable amount of time. Defendants had not made any allegations or findings that plaintiff"s minor son was in any danger of harm from plaintiff, that plaintiff had neglected his minor son, or that plaintiff was unfit to have custody of his son.

21. On or about February 17, 2005, during a supervised visit at defendant"s Madera County Department of Social Services building, social worker Nancy McCoy witnessed and documented plaintiff"s minor child sexually acting out at the beginning of a supervised visit when the minor was told that his mother would be visiting him. Social worker McCoy explained that abused children exhibit these behaviors when they have been removed from their abusers.

22. On or about February 21, 2005, the Court appointed forensic child abuse psychologist Dr. Jay Edward Fisher concluded his investigation, including psychological evaluations of the family. Dr. Fisher"s report found that plaintiff's minor child was very intelligent and was a credible witness. Dr. Fisher's report concluded that the child's mother had placed him in a situation of danger and harm, that she had physically abused her child, that she had no empathy for children, that she may suffer from frequent outbursts of extreme anger and rage directed at family members that she may claim amnesia from, that she tested critical for psychopathological markers indicating histrionic (borderline) personality disorder traits and characteristics, and that she was dishonest and expressed guilt, while attempting to present well but hide the

6

underlying truth. Dr. Fisher deferred ruling on the sexual abuse to qualified investigators that were trained in child abuse investigations, and questioning techniques, such as the CSART panel team.

23. Dr. Fisher recommended full custody to plaintiff, the non-offending parent who had nurturing skills and compassion, and high degree of honesty. The mother Curutchague was recommended supervised visits, psychotherapy, and anger management classes.

24. On or about February 21, 2005, plaintiff asked defendants Madera County Department of Social Services Child Protective Services to return his minor son based upon the findings and recommendations of Dr. Jay Edward Fisher. Defendants Madera County Department of Social Services Child Protective Services refused to return plaintiff's minor child at that time. Defendants gave no adequate reason or circumstance to plaintiff to warrant the continued detention of plaintiff's minor son. Defendants had not made any allegations or findings that plaintiff's minor son was in any danger of harm from plaintiff, that plaintiff had neglected his minor son, or that plaintiff was unfit to have custody of his son. Defendants insisted that the minor child's mother would be convicted of child abuse and plaintiff's minor child would be returned to his familial home. Defendants simply had no probable cause or justification to detain plaintiff's son from his home with his father, especially during these fearful, trying, and emotionally distressful time.

25. On or about April 11, 2005, a dependency hearing was finally held. Madera County Department of Social Services Child Protective Services failed to produce the CSART taped interview as evidence at the hearing. Defendants Madera County Department of Social Services Child Protective Services failed to reveal the whereabouts of the taped interview upon request or to conduct a search for the CSART taped interview. Defendants withheld this critical inculpatory evidence against the minor child's mother when it was within their power to do so. Defendants

Madera County Department of Social Services Child Protective Services failed to subpoena the remaining CSART panel team members to testify at the hearing, which was within their power to do so, to compel said testimony corroborating the findings of abuse against the minor child's mother reflected in the CSART taped interview.

26. On or about April 11, 2005, or shortly thereafter, defendants Madera County Department of Social Services Child Protective Services acted contrary to the evidence compiled in the case by making a recommendation that the minor child A remain in foster care, to become a dependant ward of the court, and to be removed from both parents custody. This was a shocking turnaround of defendants previous position and in opposite [sic] to the evidence. Defendants had promised that they would protect plaintiff's minor child by placing him in their temporary state custody until the appropriate paperwork was filed to return the minor child A to plaintiff's custody. The dependency hearing was contested.

27. On or about April 11, 2005, or shortly thereafter, defendants Madera County Department of Social Services Child Protective Services insisted to plaintiff that if they could convince the mother to admitting to emotional abuse, they could retain jurisdiction of the case, preventing the case from moving back to Kern County who had original jurisdiction because a family law case had been opened there, and because the mother resided there, and because the abuse was alleged to have occurred in that county. Defendant social workers explained that they feared losing jurisdiction of the case and the ability to prosecute the case within their jurisdiction. Defendants caused plaintiff to believe that if plaintiff too agreed to emotional abuse, the case would surely remain in Madera County and the mother could be tried for physical and sexual abuse of the minor child A within Madera County's jurisdiction. Defendants caused plaintiff to believe that plaintiff would be reunified with his minor son if he acquiesced to their

8

demands. Defendants advised plaintiff that emotional abuse was not an exigent circumstance or cause for the removal or continued detention of plaintiff's minor child from plaintiff. Plaintiff relied upon and complied with the Defendant's demands and instructions, for fear of loss, separation, and or injury to his minor child.

28. On or about June 10, 2005, the Madera County Traffic Court Judge Thomas Bender, sitting in as the Juvenile Court Judge, reached a decision in the dependency case. The decision found that, in relevant part to this action, and substantiated by the evidence at trial, that the minor child's mother Elizabeth Curutchague had indeed inflicted physical abuse upon her two and a half year old minor son by pinching and twisting his penis and leaving black and blue bruising, slapping him in the face, and throwing him down on the floor just for having an accident and peeing his pants on her new carpet in her brand new house that her parents had just purchased for her. Defendants, despite this finding of the court, petitioned to have the minor child remain in foster care and not to be returned to either parent. Defendants petition was shocking to this plaintiff, in that, after a case of child abuse was proven in court by clear and convincing evidence against the mother, a female, that defendants continued to maintain a position against this plaintiff father without any finding that plaintiff himself had abused, neglected, or failed to protect his minor child A, or that the minor child would be in any danger of harm by being returned to the plaintiff father.

29. On or about June 10, 2005, the Madera County Superior Court ordered the minor child A to remain a dependant ward of the juvenile court in state custody with the defendants Madera County Department of Social Services monitoring and overseeing his placement with the parents alternating visitation consisting of custodial time with both parents, and family reunification services ordered for both parents. Defendants Madera County Department of Social Services provided family

reunification services including home visits to the mother, but did not continue to or provide family reunification services to the plaintiff father. Defendants had caused the return of plaintiff's minor child for visitation with the suspected abuser by withholding inculpatory evidence.

30. On or about August 22, 2005, a child custody evaluator appointed by the court, Dr. Susan Napolitano, filed a written suspected child abuse report at Madera County Department of Social Services documenting a case of suspected child abuse that occurred in Cambria California when plaintiff's minor child was taken there by his mother Curutchague to a vacation home.

31. On or about August 23, 2005, plaintiff filed a Penal Code section 278.7 Good Cause report with the Madera City Police Department and the Madera County District Attorney's Office. The filing of this Good Cause report allows a parent who has a reasonable belief that their minor children are in danger of harm, to prevent the custodial exchange of the children until appropriate intervention is taken to protect the minor children.

32. On or about August 26, 2005, defendants Madera County Department of Social Services and defendants Upton and Williams claimed that they had investigated this new case of child abuse and found no signs of abuse of the minor child A. Defendants caused the return of plaintiff's minor child to the suspected abuser, further placing the minor in a dangerous situation with a person known to have abused him in the past.

33. On or about September 12, 2005, the plaintiff's minor child's babysitter reported suspected child abuse to the Madera City Police Department who responded and documented the minor's injuries. The minor had just returned home from his visitation with his mother Curutchague on the night of September 11, 2005. The minor had a hickey type bruise on his penis, and a blackened eye. Officer Steven Pettersen asked the minor what had happened and the minor implicated

10

his mother had done it cause she was mad and told him not to talk to anyone about it. Officer Pettersen and Sgt. Wiles instructed plaintiff not to return the minor child to the mother under any circumstances. The police informed plaintiff that the mother would be arrested. The police informed plaintiff to leave home on the scheduled exchange day, September 14, 2005, so that the minor child would not have to see his mother being arrested, and to prevent any situation of domestic violence with the mother that the minor child would inadvertently witness. Plaintiff relied upon and complied with the police commands and instructions.

34. On or about September 13, 2005, plaintiff called defendants Madera County Department of Social Services and defendant Upton to report that plaintiff and plaintiff's minor child would be staying home because of what happened, and not attending day care or the babysitter's that day. Defendant Upton had previously promised to visit plaintiff's minor child during this week, but failed to return plaintiff's calls or to complete her scheduled visit during that week. Had defendant Upton completed her home visit, she would have been interjected into the new investigation, which was her duty as the assigned case worker, and been able to observe the minor's fresh injuries and collect valuable evidence. Plaintiff believes defendant Upton deliberately and purposefully failed to complete her home visit and withheld services from plaintiff and plaintiff's minor son.

35. On or about September 13, 2005, plaintiff called the Madera City Police Department and was informed that the Department had informed and faxed the defendants Madera County Department of Social Services about the suspected child abuse report. Defendant Upton still failed to return plaintiff's phone call or attempt to correspond or investigate with plaintiff or the minor's babysitter. Plaintiff believes that defendants could have responded to investigate and possibly have collected valuable evidence including DNA, but did not do so because the minor was a

11

male child, not a female. Plaintiff believes that defendants acted with indifference to plaintiff and plaintiff's minor son based upon their racial ethnicity and or gender. Plaintiff believes defendants including Upton deliberately and purposefully failed to investigate and withheld services from plaintiff and plaintiff's minor son.

36. On or about September 15, 2005, plaintiff contacted Madera City Police Department officer Sgt. Wiles and was informed that defendants Madera County Department of Social Services and defendant Upton were alleging that plaintiff had kidnaped and or abducted the minor child. Officer Sgt. Wiles asked if plaintiff would voluntarily return to the Police Department with the minor child and talk to Sgt. Wiles so that the misunderstanding could be explained to defendant Upton.

37. Earlier on or about the morning of September 15, 2005, at that time a fact unbeknownst to plaintiff or plaintiff's counsel, defendants Madera County Department of Social Services engaged in ex parte communications with the juvenile court judge Bender, without notice to plaintiff or plaintiff's counsel. The ex parte conversation with the juvenile court judge was not transcribed by the court reporter. It is uncertain as yet, what misrepresentations were made about plaintiff or the circumstances. It is certain that the ex parte communications served to prejudice the juvenile court judge Bender against plaintiff, causing an appearance of impropriety, and damaging and injuring plaintiff.

38. Later that day, on or about September 15, 2005, plaintiff arrived at the Madera City Police Department with his minor child and met with Sgt. Wiles and the defendant Upton, whereupon Sgt. Wiles informed defendant Upton that he in fact had instructed his officer Pettersen to instruct plaintiff not to return his minor child to the child abuse suspect mother under any circumstances, and to leave his home on the scheduled exchange day so as

12

not to place the minor child in any domestic dispute. Sgt. Wiles confirmed that defendant Upton had received the suspected child abuse police report on or about September 13, 2005. At that time the minor child was turned over to defendant Upton.

39. Later that day, on or about September 15, 2005, at approximately 4:00 p.m., plaintiff's attorney was given telephone notice of an ex parte hearing scheduled for 8:30 a.m. on September 16, 2005, in the Madera County Superior Juvenile Court. The late notice did not allow plaintiff or plaintiff's attorney to subpoena witnesses, obtain police reports, gather evidence, or even to have knowledge, understanding, or opportunity to perceive why an ex parte hearing was being calendared. Plaintiff expected that the hearing was called to obtain an emergency protective order for plaintiff's minor child, and or to remove plaintiff's minor child from the custodial visitation of the minor's mother, based upon the new incident of child abuse reported to the Madera City Police Department.

40. On or about September 16, 2005, plaintiff and plaintiff's attorney attended the ex parte hearing. Plaintiff was prevented from sitting at the counsel table with the other parties. Plaintiff's counsel asked the Juvenile Court Judge Bender to place the minor child into plaintiff's custody and to order a CSART interview of the minor child. Judge Bender abruptly said "No" your requests are denied. I [Bender] am taking the child away from Mr. Clarke [plaintiff herein], cancelling all visitation, and I am ordering a psychological evaluation and then I may allow supervised visits. I, plaintiff, was shocked. I attempted to lean forward to talk to my attorney, as I was not allowed to sit at the counsel table as all other parties were, and Judge Bender yelled out loud, sit down and be quiet [Mr. Clarke]. Plaintiff's counsel was shocked. Plaintiff's counsel stated to Judge Bender "without an opportunity for my client to be heard?"

41. Judge Bender said you had your

13

opportunity to be heard, that"s it. I believe
Mr. Clarke is the problem here. Plaintiff's
counsel asked "what are you basing your
conclusion on?" Judge Bender said the papers
that have been filed with the court, which
included evidence submitted by the defendants
Madera County Department of Social Services
that plaintiff had kidnaped his minor child.
Plaintiff's counsel replied that due to the
ex parte hearing, plaintiff has not had an
opportunity to present any filings to the
court. Judge Bender was indifferent.
Defendant Upton was present and remained
silent throughout the hearing, failing to
disclose exculpatory evidence within her
power to do so, including the police report
of suspected child abuse and her testimony
that MPD Sgt. Wiles had instructed plaintiff
not to return his minor son.

42. The ex parte hearing herein referenced
was not a meaningful hearing where plaintiff
was allowed to present evidence, cross-
examine witnesses, or challenge and object to
defendants evidence against plaintiff.
Plaintiff is informed and believes that
defendants and Upton fabricated evidence and
withheld exculpatory evidence in order to
illegally obtain a temporary court order
against plaintiff because of racial and or
gender bias and in retaliation for plaintiff
lawfully reporting suspected child abuse.

43. Due to defendants Madera County
Department of Social Services, Upton and
Williams, fabricating false evidence of
kidnaping and failing to disclose exculpatory
evidence, plaintiff lost all custody and
visitation with his minor son, for lawfully
reporting suspected child abuse. The loss of
all visitation rights lasted for over one
month, which was not in the best interest of
plaintiff's minor son A, and caused severe
emotional distress to plaintiff. Plaintiff
was placed on paid therapeutically supervised
visits of one hour a week for almost two
years, causing a continued long term and
pervasive emotional distress to both
plaintiff father and to his minor child A.

44. Defendants did not initiate a hearing

14

until October 11, 2005, concerning the false kidnaping charges. Plaintiff was not allowed any visitation with his minor son. Plaintiff was not allowed to present evidence or witnesses at the hearing. Plaintiff believes that the hearing was not within a meaningful time and violated procedural due process.

45. During the two and a half years that plaintiff's minor child was a dependant ward in state custody, defendants were ordered to provide family reunification services including monthly home visits to plaintiff and the minor child's mother. Defendants completed only two home visits with plaintiff out of 33 available months. Defendants withheld services and discriminated against plaintiff because of racial and or gender bias and in retaliation for lawfully reporting suspected child abuse. Defendants did complete monthly home visits with the minor child's mother who lived two hours out of town in Kern County, while plaintiff lived here in Madera County.

46. Plaintiff filed a complaint with the Madera County Grand Jury who was already investigating the defendants Madera County Department of Social Services. The Grand Jury found many violations and discriminatory practices by defendants Madera County Department of Social Services and notified them of their findings in their 2006 final report.

47. Plaintiff complained to the supervisors and management at the defendants Madera County Department of Social Services. Plaintiff asked to have defendant Upton removed from the case. Defendants Madera County Department of Social Services refused to take any action and was indifferent to plaintiff's complaints and concerns supporting their policy of discrimination against plaintiff because of racial and or gender bias and in retaliation for lawfully reporting suspected child abuse.

48. During the months leading up to the hearing on the false allegations of kidnaping, defendant Upton attempted to

15

exonerate the child abuse suspect mother by
altering a pediatrician's medical report
claiming that Dr. Naz had told her that the
minor child's penis could turn colors and
that explained his injuries. Upton submitted
her Social Worker report as evidence with
these fabricated claims.

49. On or about April 18, 2006, during
Juvenile Court hearings, Dr. Naz testified
that he did not tell defendant Upton that a
child's penis could turn colors.

50. On or about September 5, 2007 plaintiff
ultimately prevailed in the dependency
hearing by regaining joint physical and joint
legal custody of his minor child and the
dependency action was terminated.

The First Cause of Action is against all Defendants for
violation of 42 U.S.C. § 1983 and seeks damages against
Defendants "for committing acts, under color of law, which
deprived plaintiff of rights secured under the Constitution and
laws of the United States; for conspiring for the purpose of
impeding and hindering the due course of justice, with the intent
to deny plaintiff equal protection of the laws; and for refusing
or neglecting to prevent such deprivations and denials to
plaintiff."  The First Cause of Action alleges:

55.  Plaintiff is informed and believes and
alleges that defendants, and each of them,
negligently and/or intentionally falsified
and/or misrepresented evidence in juvenile
dependency proceedings involving the
placement of plaintiff's minor child ...,
resulting in plaintiff's loss of custody,
loss of visitation rights, and other rights
protected under the United States
Constitution and the Fourth and Fourteenth
Amendments, including plaintiff's fundamental
right to participate in the parenting and
raising of his son.

56. Plaintiff is informed and believes that, in taking the action herein alleged, defendants, and each of them, were motivated by racial and/or gender bias based on plaintiff's American Indian ancestry and/or plaintiff's male gender, and/or in retaliation for plaintiff's reporting of suspected child abuse.

The Second Cause of Action is against all Defendants for violation of Section 1983 "by failure to disclose exculpatory evidence."  The Second Cause of Action alleges:

64. As set out herein, plaintiff was charged with kidnaping and/or child abduction and/or other criminal charges arising from an alleged violation of custody and/or visitation orders concerning plaintiff's son A.

65. As a result of these charges, plaintiff's custody and/or visitation rights concerning his son A were terminated and/or curtailed for a substantial period of time, plaintiff suffered the loss of his fundamental right to participate in the raising and parenting of A, and otherwise suffered a loss of rights protected under the United States Constitution and the Fourteenth Amendment.

66. Plaintiff is informed and believes and alleges that defendants, and each of them, knew at all times relevant to this dispute that plaintiff had not kidnaped his son A, had not violated any court-issued custody or visitation orders regarding his son A, and that plaintiff had at all times acted upon instructions given to him by officers and detectives of the Madera Police Department.

67. Plaintiff is further informed that defendants, and each of them, had an obligation to reveal to the court, the prosecutors and other officials their knowledge regarding plaintiff's actions as herein set out and that, had defendants done so, plaintiff would not have suffered the losses alleged herein.

17

68. Plaintiff is informed and believes that, in taking the action herein alleged, defendants, and each of them, were motivated by racial and/or gender bias based on plaintiff's American Indian ancestry and/or plaintiff's male gender, and/or in retaliation for plaintiff's reporting of suspected child abuse.

The Third Cause of Action is against all Defendants for intentional infliction of emotional distress. The Fourth Cause of Action is against all Defendants for negligent infliction of emotional distress.

The Fifth Cause of Action is against all Defendants for violation of 42 U.S.C. § 1985 and alleges that Defendants

88. ... conspired to ... have false charges of kidnaping and/or child abduction brought against plaintiff, and/or to allow such charges to be brought, knowing such charges were false, while withholding exculpatory evidence and thereby ensuring that plaintiff lost custody of his minor son A, and that A was placed with plaintiff's former spouse, and to prevent plaintiff from having a prompt, meaningful and fair hearing regarding such charges, all in violation of plaintiff's right to due process under the laws of the United States.

89. Plaintiff is informed, believes and, based thereon alleges that defendants, and each of them, engaged in said conspiracies for the purpose of depriving plaintiff of equal protection ... The conspiracy was motivated by invidious discrimination against plaintiff on the basis of plaintiff's American Indian ancestry and/or plaintiff's male gender, and/or in retaliation for plaintiff's reporting of suspected child abuse.

The Sixth Cause of Action is against all Defendants for violation of 42 U.S.C. § 1986. The Sixth Cause of Action

alleges:

94.  Plaintiff is informed and believes and, based thereon alleges that defendants, and each of them, maintain, and at all times relevant to this complaint maintained, customs and practices which were the driving force behind their conspiracy to interfere with plaintiff's civil rights in violation of 42 U.S.C. section 1985 ... Such customs and practices include the procuring of false testimony, fabrication of evidence, and refusal to disclose exculpatory evidence in preparing and presenting reports and court documents to the Court in relation to dependency proceedings, all in violation of the right to familial relations under the Due Process Clause of the Fourteenth Amendment.

95.  Plaintiff is informed, believes and, based thereon alleges that, at all times herein relevant, defendant County of Madera and defendant Department of Social Services had knowledge of the customs and practices that led to the conspiracy to interfere with plaintiff's civil rights, and knew that the remaining defendants, and each of them, were conspiring to commit wrongs, and were going to commit them.

96.  Defendant County of Madera and defendant Department of Social Services, and each of them, had the power to prevent the commission of these wrongs, through the implementation of policies, procedures, and training programs that would educate and enlighten their employees as to the civil rights of the citizens of the United States and the State of California.

97.  Despite their knowledge, defendant County of Madera and defendant Department of Social Services refused or neglected to prevent the remaining defendants from committing these wrongs in violation of 42 U.S.C. section 1985 [sic].

The Seventh Cause of Action is against Defendant County of Madera and Defendant Department of Social Services "for *Monell-*

19

related claims."  The Seventh Cause of Action alleges:

> 101.  Plaintiff is informed, believes and, based thereon alleges that defendants, and each of them, established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as 'policy' or 'policies') which policies were the moving force behind the violation of plaintiff's constitutional rights ... by, but not limited to:

> • the policy of using trickery, duress, fabrication and/or false testimony or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court causing an interference with plaintiff's rights, including those as to familial relations and injuring and harming them; and

> • by acting with deliberate indifference in implementing a policy of inadequate training, and/or by failing to train its officers, agents, employees and state actors, in providing the Constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to child abuse and dependency type proceedings.

> • Other actions in violation of plaintiff's constitutional rights due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings.

Defendants move to dismiss the Fifth Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).  Defendants move to strike the Fifth, Sixth, and Seventh Causes of Action and allegations related to punitive damages against the County of Madera and the Department of Social Services.

Plaintiff opposes the motions and also moves for leave to file a Sixth Amended Complaint.  Plaintiff seeks leave to file the Sixth Amended Complaint to name his son Ambroise as a plaintiff and to include him in the allegations against Defendants and to include an allegation of compliance with the California Tort Claims Act.[1]

B.  <u>GOVERNING STANDARDS</u>.

1.  <u>Motion to Dismiss</u>.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).  "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.*, 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007).  "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, *id.* at 1964-1965.  Dismissal of a claim under Rule 12(b)(6) is

---

[1]Plaintiff has filed an application to be appointed guardian ad litem for Ambroise.  Plaintiff's application, which is opposed by Defendants, is the subject of a separate Memorandum Decision.

appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984). In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003). Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Parrino v. FHP, Inc*, 146 F.3d 699, 705-706 (9th Cir.1988).

        2.   <u>Motion to Strike</u>.

Rule 12(f) provides in pertinent part that the Court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are disfavored and infrequently granted. *Neveu v. City of Fresno,* 392 F.Supp.2d 1159, 1170 (E.D.Cal.2005). A motion to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation. *Id.* The function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that might arise from litigating spurious issues by dispensing with those issues prior to trial. *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on other grounds*, 510 U.S. 517 (1994).

C.  <u>SUPPLEMENTAL STATE LAW CAUSES OF ACTION</u>.

Defendants move to dismiss the Third and Fourth Causes of Action because Plaintiff has not pleaded compliance with the claim requirement of the California Tort Claims Act.

Plaintiff responds by submitting his declaration in which he avers:

> 3.  On March 13, 2006, I filed claims with Madera County on my behalf and on behalf of my son Ambroise Clarke, regarding the matters raised in this action, in compliance with the California Government Tort Claims Act, and so pled in the complaints and amended complaints I filed in the Madera County Superior Court. I inadvertently omitted such allegations from the Fourth Amended Complaint I filed in this Court, and I believe my attorney inadvertently omitted such allegations in the Fifth Amended Complaint ...

23

6.  I am informed and believe that the defendants, and each of them, are familiar with my prior pleadings and are aware of my compliance with the Tort Claims Act, and for that reason did not raise this objection in response to my Fourth Amended Complaint, even though this allegations [sic] was also missing from that complaint.

7.  I am informed and believe that copies of the Claims I filed on my behalf and on Ambroise's behalf are already before this Court as attachments to my prior pleadings.

Plaintiff seeks leave to include an allegation of compliance with the California Tort Claim Act in the proposed Sixth Amended Complaint.

Defendants argue that leave to amend should be denied. Defendants contend that Plaintiff's waiver argument should fail because Plaintiff is required to reallege all necessary allegations in amended pleadings; therefore, Defendants' failure to move for dismissal of the Fourth Amended Complaint on this ground cannot constitute a waiver.  Further, Defendants argue, leave to amend should be denied because the Fifth Amended Complaint makes allegations which may be different from those alleged in Plaintiff's prior complaints.

Defendants' contentions are without merit.  If Plaintiff did file a timely claim under the California Tort Claims Act, that is a fact which must be alleged.  If Defendants conclude that the claims made in the tort claim differ substantially from those made in the Sixth Amended Complaint, Defendants can move for dismissal or summary judgment on that ground.  To preclude leave to amend under these circumstances will violate Rule 15(a)'s

stricture that leave to amend should be freely granted when justice so requires.

Defendants' motion to dismiss the Third and Fourth Causes of Action is DENIED. Plaintiff's motion for leave to amend to include an allegation that Plaintiff timely complied with the requirements of the California Tort Claims Act is GRANTED.

D. **FIRST AND SECOND CAUSES OF ACTION FOR VIOLATION OF SECTION 1983 - ABSOLUTE IMMUNITY**.[2]

Defendants move to dismiss the First and Second Causes of Action on the ground that Defendants Williams and Upton are entitled to absolute immunity from liability for damages under Section 1983. Defendants contend that the allegations of the Fifth Amended Complaint show that Plaintiff is in essence seeking to hold Defendants liable for their role in initiating and maintaining child custody hearings.[3]

---

[2]In the May 9 Decision, the Court deferred ruling on Defendants' claims of absolute and qualified immunity pending completion of limited discovery. Defendants acknowledge this ruling but argue that the more detailed allegations of the Fifth Amended Complaint allow revisiting of these issues.

[3]Plaintiff responds that the May 9 Decision ruled that California Government Code § 820.21, if applicable, "would preclude that immunity." Plaintiff's contention is without merit. The May 9 Decision did not hold that absolute immunity from liability for damages under Section 1983 is precluded by California Government Code § 820.21. The May 9 Decision, discussing dismissal of Plaintiff's *state law* causes of action, held that "[b]ecause of Government Code § 820.21 and Plaintiff's allegations, factual development will be necessary to determine whether or not the immunities in Government Code §§ 818.2 and 821 apply to Defendants." *See also Parkes v. County of San Diego*, 345 F.Supp.2d 1071, 1087 n.8 (S.D.Cal.2004)("This Court finds Section 820.21 does not effect [sic] federal immunity principles available to social workers for conduct undertaken in the initiation and pursuit of dependency proceedings in a section 1983 claim.").

The only allegations in the Fifth Amended Complaint pertaining specifically to Defendants Upton and Williams are set forth in Paragraphs 32-43.

The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486-487 (1991).

In *Meyers v. Contra Costa County Dept. of Soc. Serv.*, 812 F.2d 1154, 1157 (9th Cir.), *cert. denied*, 484 U.S. 829 (1987), the Ninth Circuit held:

> Although child services workers do not initiate criminal proceedings, their responsibility to exercise independent judgment in determining when to bring such proceedings, is not very different from the responsibility of a criminal prosecutor. The social worker must make a quick decision based perhaps on incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children. The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit. We therefore hold that social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings.

In *Miller v. Gammie*, 335 F.3d 889 (9th Cir.2003), the Ninth Circuit approved a district court's deferral of a ruling on absolute immunity until completion of limited discovery on what

26

functions defendants performed.  The Ninth Circuit stated:

> The Supreme Court in *Imbler* laid down an
> approach that granted state actors absolute
> immunity only for those functions that were
> critical to the judicial process ... At
> common law, judges, prosecutors, trial
> witnesses, and jurors were absolutely immune
> for such critical functions ....
>
> *Imbler* also settled the general scope and
> rationale of a prosecutor's immunity.  Only
> in 'initiating a prosecution and in
> presenting the State's case' is the
> prosecutor absolutely immune ... That is
> because the prosecutor often must make
> 'decisions that could engender colorable
> claims of constitutional deprivation' upon
> short notice and with poor information ...
> Exposing a prosecutor, years and many cases
> later, to civil damages for a particular
> prosecutorial decision could impose
> intolerable burdens of the prosecutor and
> unduly hamper the prosecutor's performance
> ... There are protections from abuse despite
> the broad grant of immunity.  The duties of
> the trial judge, and the adversarial and
> appellate processes, are designed to prevent
> many potential violations of constitutional
> rights ...
>
> Our court has recognized that family-service
> social workers ... appear to perform some
> functions similar to those of prosecutors,
> but perform other functions as well.  Our
> relevant circuit law begins with *Meyers v.
> Contra Costa County Department of Social
> Services* ..., where we took a narrow view of
> absolute immunity for social workers.  In
> *Meyers*, we held that the initiation and
> pursuit of child-dependency proceedings were
> prosecutorial in nature and warranted
> absolute immunity on that basis.  We were
> careful there, however, to distinguish
> between a social worker's activities
> performed as an advocate within the judicial
> decision-making process, a function for which
> there is common-law absolute immunity, and
> other actions taken by a social worker ... We
> found that unless the social worker's
> activity has a requisite connection to the

judicial process, only qualified immunity is available ....

*Babcock* extended the coverage of absolute immunity to include post-litigation activities. *Babcock*, 884 F.2d at 503. Our court in *Babcock* saw a fundamental inconsistency in protecting social workers from liability for actions taken up through the adjudication of dependency, and then exposing them to liability for the subsequent, post-adjudication and placement decisions approved by court orders ... Thus, we held that all actions taken in 'connection with' and 'incident to' ongoing child dependency proceedings were entitled to absolute immunity ....

Four years after *Babcock*, the Supreme Court held in *Antoine*, however, that absolute immunity shields only those who perform a function that enjoyed absolute immunity at common law. Even actions taken with court approval or under a court order are not in and of themselves entitled to quasi-judicial, absolute immunity. *Antoine*, 508 U.S. at 435-36 ... Instead, to enjoy absolute immunity for a particular action, the official must be performing a duty functionally comparable to one for which officials were rendered immune at common law. Therefore, a prosecutor's submission of an affidavit to the court as a witness, as in *Kalina*, or a court reporter's preparation of a transcript for the court, as in *Antoine*, were not absolutely immune because those functions were not absolutely immune at common law.

The Court in *Kalina* further emphasized that it is only the specific function performed, and not the role or title of the official, that is the touchstone of absolute immunity ... Officials performing the duties of an advocate or judge may enjoy absolute immunity for some functions traditionally performed at common law, but that protection does not extend to many of their other functions ... The Court said that although a prosecutor is fully protected by absolute immunity when performing the traditional functions of an advocate in a criminal prosecution, only

qualified immunity shields the prosecutor acting as a complaining witness in presenting a judge with a supporting affidavit to establish probable cause for an arrest.  This is because the common law did not recognize absolute immunity for such functions when the civil-rights statute was passed in 1871 ... We must now recognize that beyond these functions historically recognized as absolutely immune at common law, qualified and only qualified immunity exists.

...

We look to functions that enjoyed absolute immunity at common law in 1871 ... The relation of the action to the judicial proceeding, the test we formulated in *Babcock,* is no longer a relevant standard.

This is apparent when we look at the underlying facts in those intervening Supreme Court cases.  *Antoine* rejected absolute immunity for court reporters.  Court reporters, despite being 'indispensable to the appellate process,' do not exercise the sort of judgment for which there is quasi-judicial immunity ... The court reporter has no power of decision in the judicial sense ... *Kalina* rejected absolute immunity for a prosecutor attesting to facts in an affidavit supporting an application for an arrest warrant.  The function was held to be similar to that of a complaining, out-of-court witness.  The Court concluded that acting as such a witness is not a function that requires the exercise of an advocate's judgment ....

Our decision in *Meyers* is consistent with the controlling Supreme Court decisions.  *Meyers* recognized absolute immunity for social workers only for the discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents ... At least two of our sister circuits have also recognized that the scope of absolute immunity for social workers is extremely narrow.  *See, e.g., Snell v. Tunnell*, 920 F.2d 673, 686-91 (10th Cir.1990)(denying absolute immunity to social

29

workers for the function of seeking a protective order that did not initiate court proceedings); *Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 135-38 (4th Cir.1989). In *Vosburg*, citing our decision in *Meyers*, the Fourth Circuit held social workers absolutely immune from liability resulting from a decision to file a removal petition, but not immune for investigating whether a removal petition should be filed ....

Here, the district court was obligated to examine the functions Gammie and Zito performed; however, those functions were unclear.  Morever, the defendants bear the burden of showing that their respective common-law functional counterparts were absolutely immune.  It would appear that the critical decision to institute proceedings to make a child a ward of the state is functionally similar to the prosecutorial institution of a criminal proceeding.  The decision, therefore, is likely entitled to absolute immunity.  It also may be that some submissions to the court by social workers are functionally similar to the conduct recognized at common law to be protected by absolute prosecutorial immunity ....

To the extent, however, that social workers also make discretionary decisions and recommendations that are not functionally similar to prosecutorial or judicial decisions, only qualified, not absolute, immunity, is available.  Examples of such functions may include decisions and recommendations as to the particular home where a child is to go or as to the particular foster parents who are to provide care.  On this record, we cannot make that determination.  However, such placement decisions may not be 'judicial' or 'prosecutorial' decisions of the type that would have enjoyed common-law immunity.

The district court, therefore, must apply the guiding principles to the allegations concerning the defendants in this case.  The therapist, Zito, allegedly provided only treatment and diagnosis.  She apparently is not alleged to have performed any quasi-

> judicial or prosecutorial function that
> enjoyed absolute immunity at common law,
> unless discovery discloses that she performed
> other functions more directly related to the
> prosecution of the dependency proceedings.
>
> With respect to the social worker, Gammie,
> the precise functions performed that
> allegedly give rise to liability are not
> clear from the existing complaint.  Moreover,
> state laws may differ as to the functions
> social workers perform.  Under the functional
> analysis laid out by the Supreme Court, the
> district court did not err when it deferred
> ruling on the motion to dismiss on the
> pleadings until the nature of the functions
> the defendants allegedly performed was
> sufficiently outlined to permit the court to
> apply *Antoine* and *Kalina*.

335 F.3d at 896-899.

In *Doe v. Lebbos*, 348 F.3d 820, 825-826 (9th Cir.2003),

*cert. denied,* 542 U.S. 904 (2004):

> The Does contend that Herrera both failed to
> investigate possible exculpatory evidence and
> fabricated evidence in the dependency
> petitions she submitted to the dependency
> court.  Herrera, however, engaged in these
> actions as part of her initiation and pursuit
> of child dependency proceedings – she filed
> a dependency petition in state court on
> November 4, 1999, and dependency proceedings
> were held on November 5, 1999.  Herrera's
> actions therefore had the 'requisite
> connection to the judicial process' to be
> protected by absolute immunity.  *Miller,* 335
> F.3d at 896.
>
> Indeed, in *Meyers v. Contra Costa County
> Department of Social Services,* 812 F.2d 1154,
> 1157 (9th Cir.1987), we recognized that
> 'social workers are entitled to absolute
> immunity in performing quasi-prosecutorial
> functions connected with the initiation and
> pursuit of child dependency proceedings.'
> *See also Imbler*, 424 U.S. at 416, 431 & n.34
> ... (holding that prosecutors are entitled to
> absolute immunity 'in initiating a

31

> prosecution and in presenting the State's case,' even where the prosecutor willfully used perjured testimony and willfully suppressed exculpatory information at trial); *Miller*, 335 F.3d at 898; *Mabe*, 237 F.3d at 1109 (holding, where there are allegations that social workers did not conduct their investigation properly and submitted false evidence during juvenile court proceedings, that the social workers were entitled to absolute immunity because their actions were part of the initiation and pursuit of dependency proceedings).

However, *Doe v. Lebbos* was overruled by *Beltran v. Santa Clara County*, 514 F.3d 906 (9th Cir.2008).  In *Beltran*, Suarez, a social worker for Santa Clara County's child protective services, investigated whether Lori Beltran was abusing her son.  After this investigation, Suarez's supervisor, Tjhin, filed a child dependency petition, which Tjhin signed under penalty of perjury. The petition included a three-page statement of facts describing the findings of Suarez's investigation.  Suarez also filed a separate custody petition, which she signed under penalty of perjury.  The custody petition attached and incorporated by reference the three-page statement of facts from the dependency petition.  The dependency petition was denied.  The Beltrans sued Suarez and Tjhin under Section 1983, charging constitutional violations in removing the son from the Beltrans' custody and attempting to place him under the supervision of the state. Specifically, the Beltrans claimed that Suarez and Tjhin fabricated much of the information in the three-page statement of facts.  The district court, relying on *Doe v. Lebbos*, held that Suarez and Tjhin had absolute immunity for their actions

1  connected to signing and filing the dependency and child custody

2  petitions, including the alleged fabrication of evidence and

3  false statements, and dismissed those claims.   The Ninth Circuit

4  held:

5           Parties to section 1983 suits are generally
            entitled only to immunities that existed at
6           common law.  *Imbler v. Pachtman*, 424 U.S.
            409, 417-418 ... (1976).  We have therefore
7           'granted state actors absolute immunity only
            for those functions that were critical to the
8           judicial process itself,' such as
            '"initiating a prosecution."'  *Miller v.*
9           *Gammie*, 335 F.3d 889, 898 (9th Cir.2003) ...
            It follows that social workers have absolute
10          immunity when they make 'discretionary,
            quasi-prosecutorial decisions to institute
11          court dependency proceedings to take custody
            away from parents.  *Id.* at 898.  But they are
12          not entitled to absolute immunity from claims
            that they fabricated evidence during an
13          investigation or made false statements in a
            dependency petition that they signed under
14          penalty of perjury, because such actions
            aren't similar to discretionary decisions
15          whether to prosecute.  A prosecutor doesn't
            have absolute immunity if he fabricates
16          evidence during a preliminary investigation,
            before he could properly claim to be acting
17          as an advocate, *see Buckley v. Fitzsimmons*,
            509 U.S. 259, 275 ... (1993), or makes false
18          statements in a sworn affidavit in support of
            an application for an arrest warrant, *see*
19          *Kalina v. Fletcher*, 522 U.S. 118, 129-30 ...
            (1997).  Furthermore, as prosecutors and
20          others investigating criminal matters have no
            absolute immunity for their investigatory
21          conduct, a fortiori, social workers
            conducting investigations have no such
22          immunity.  *See id.* at 126 ....

23          The district court's error is perfectly
            understandable, as it relied on our incorrect
24          absolute immunity ruling in *Doe v. Lebbos*,
            which we overrule today.

25  514 F.3d at 980-909.

26

                                    33

The allegations of the Fifth Amended Complaint do not in all instances describe the function(s) either Defendant Upton and/or Williams were performing. The Fifth Amended Complaint is also unclear whether liability against Defendants Upton and Williams is limited to the events described in Paragraphs 32-43. It appears that all of the alleged actions or inactions occurred during on-going child dependency proceedings, i.e., that neither Defendant filed allegedly false or fabricated documents in order to *institute* child dependency proceedings. At the hearing, Plaintiff repeatedly stated that the gravamen of his claim is not that Defendants Williams and Upton initiated the child dependency proceeding, but that they sat silent during proceedings initiated by Ambroise's mother and Ambroise's attorney on September 15, 2005 and did not reveal to the Judge at the hearing on September 16, 2005, the allegedly exculpatory or impeaching evidence, thereby violating *Brady v. Maryland*, 373 U.S. 83 (1963).

It is unclear whether *Brady v. Maryland* has any application to civil child dependency proceedings. In *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir.1993), *cert. denied*, 513 U.S. 914 (1994), the Sixth Circuit, noting that the Supreme Court has never stated that the *Brady* rule applies in civil cases, extended *Brady* to cover denaturalization and extradition cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party proceeding against. *But see In re Extradition of Drayer*, 190 F.3d 410, 414-415 (6th Cir.1999), distinguishing *Demjanjuk*. Cases holding that *Brady*

34

does not apply to civil cases are *Tandon v. C.I.R.*, 2000 WL 331926 (6th Cir.2000)("This Circuit has never applied the *Brady* rule to a civil proceeding for determining the amount of one's tax liability."); *N.L.R.B. v. Nueva Engineering, Inc.*, 761 F.2d 961, 969 (4th Cir.1985)("An action for violations of the National Labor Relations Act is civil in nature, does not involve potential incarceration and violation of the Act does not carry with it the stigma of a criminal conviction.); *Mister Discount Stockbrokers, Inc. v. S.E.C.*, 768 F.2d 875, 878 (7th Cir.1985)(*Brady* does not apply to a securities administrative disciplinary proceeding); *United States ex rel. (Redacted) v. (Redacted)*, 209 F.R.D. 475, 481-483 (D.Utah 2001)(*Brady* principles do not apply to an action brought under the False Claims Act); *compare Sperry v. Hutchinson Co. v. FTC*, 256 F.Supp. 136, 142 (S.D.N.Y.1966)("Presumably the essentials of due process at the administrative level require similar [*Brady*] disclosures by the agency where consistent with the public interest. In civil actions, also, the ultimate objective is not that the Government 'shall win a case, but that justice be done.'"); *EEOC v. Los Alamos Constructors, Inc.*, 382 F.Supp. 1373, 1383 n.5 (D.N.M.1974)("*Brady* [] orders that exculpatory evidence must be furnished a defendant in a criminal case. A defendant in a civil case brought by the Government should be afforded no less due process of law."). No cases have been located analyzing whether *Brady v. Maryland* applies in child dependency proceedings, although some cases simply assumed that *Brady* applies.

Assuming, *arguendo*, that *Brady v. Maryland* applies to child dependency proceedings, there is Ninth Circuit authority that potentially applies to Plaintiff's Section 1983 claim that Defendants Upton and Williams failed to disclose exculpatory evidence. In *Tennison v. City and County of San Francisco*, 548 F.3d 1293, 1301 (9th Cir.2008), the Ninth Circuit reiterated that *Brady* imposes an obligation on investigators, not just prosecutors, to disclose exculpatory evidence. However, in *Raley v. Ylst*, 444 F.3d 1085 (9th Cir.), *amended by* 470 F.3d 792 (9th Cir.2006), *cert. denied,* ___ U.S. ___, 128 S.Ct. 59 (2007):

> In order to prevail on a *Brady* claim, a defendant must demonstrate that: (1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice resulted ... Nonetheless, 'where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense.'

470 F.3d at 804.

According to the Fifth Amended Complaint, Plaintiff, who was represented by counsel throughout most of the relevant time, was always aware of the allegedly undisclosed evidence. At the hearing, Plaintiff argued that *Brady* applies because Plaintiff had no effective opportunity to present this evidence.

Plaintiff's contention that he had no effective opportunity to present exculpatory or impeachment evidence known to him does not equate to a violation of *Brady v. Maryland;* Plaintiff knew of

36

the evidence.  A *Brady* violation does not occur because the allegedly exculpatory or impeachment evidence was not brought to the attention of the *Court*.  Nothing prevented Plaintiff from advising the state court of the existence of the alleged evidence.  Finally, in *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir.2001), the Ninth Circuit stated:

> Devereaux also accuses Carrow of withholding exculpatory evidence, but (1) he does not argue that the requirements of *Brady v. Maryland* ... apply to social workers at the investigative and charging stages, and (2) in any event, a *Brady* violation cannot in itself support a deliberate fabrication-of-evidence claim – if it did, then any prisoner with a successful *Brady* claim would be able to bring a § 1983 action against the prosecutor for deliberate fabrication of evidence, and would be able to get past summary judgment.

To the extent that the Fifth Amended Complaint alleges claims against Defendants for presenting false or perjured testimony *during* the child dependency hearings, *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983), holds that a witness has absolute immunity from liability for civil damages under Section 1983 for giving perjured testimony at trial; *see also Franklin v. Terr*, 201 F.3d 1098, 1101-1102 (9th Cir.2000).

Consequently, to the extent the Fifth Amended Complaint alleges that Defendants Upton and Williams violated Section 1983 by withholding exculpatory or impeachment evidence or failing to present evidence inculpating the mother during child dependency hearings in state court, Plaintiff has not stated a claim upon which relief can be granted and/or Defendants Upton and Williams

37

are entitled to absolute prosecutorial immunity.

Otherwise, the allegations of the Fifth Amended Complaint do not permit a determination of the function(s) being performed by either Defendants Upton or Williams. *Miller v. Gammie*, *supra*, permits the District Court to defer ruling on a motion to dismiss on the ground of absolute immunity until completion of limited discovery on what functions defendants performed.

Defendants' motion to dismiss on the ground of absolute immunity is DEFERRED pending completion of limited discovery.

E. <u>FIRST AND SECOND CAUSES OF ACTION - QUALIFIED IMMUNITY</u>.

Defendants move to dismiss the First and Second Cause of Action on the ground that Defendants Williams and Upton are entitled to qualified immunity from liability for damages under Section 1983.

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009), the Supreme Court summarized the purpose of qualified immunity:

> Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of

38

law, a mistake of fact, or a mistake based on
mixed questions of law and fact." *Groh v.
Ramirez*, 540 U.S. 551 (2004) (Kennedy, J.,
dissenting) (citing *Butz v. Economou*, 438
U.S. 478, 507 (1978) (noting that qualified
immunity covers "mere mistakes in judgment,
whether the mistake is one of fact or one of
law")).

Because qualified immunity is "an immunity
from suit rather than a mere defense to
liability ... it is effectively lost if a
case is erroneously permitted to go to
trial." *Mitchell v. Forsyth*, 472 U.S. 511,
526 (1985) (emphasis deleted). Indeed, we
have made clear that the "driving force"
behind creation of the qualified immunity
doctrine was a desire to ensure that
"'insubstantial claims' against government
officials [will] be resolved prior to
discovery." *Anderson v. Creighton*, 483 U.S.
635, 640, n. 2 (1987). Accordingly, "we
repeatedly have stressed the importance of
resolving immunity questions at the earliest
possible stage in litigation." Hunter v.
Bryant, 502 U.S. 224, 227 (1991) (per
curiam).

Deciding qualified immunity normally entails a two-step analysis.
*Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, "taken in the
light most favorable to the party asserting the injury, do the
facts alleged show the officers' conduct violated a
constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201
(2001).  If the court determines that the conduct did not violate
a constitutional right, the inquiry is over and the officer is
entitled to qualified immunity.  However, if the court determines
that the conduct did violate a constitutional right, *Saucier*'s
second prong requires the court to determine whether, at the time
of the violation, the constitutional right was "clearly
established."  *Id*.  "The relevant, dispositive inquiry in

39

determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case. *Id*. at 201. Even if the violated right is clearly established, *Saucier* recognized that, in certain situations, it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he faces. If an officer makes a mistake in applying the relevant legal doctrine, he is not precluded from claiming qualified immunity so long as the mistake is reasonable. If "the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense." *Id*. at 205. In *Pearson*, the Supreme Court ruled that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson, id.* at 818. "The judges of the district courts and the courts of appeal should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. In *Brosseau v. Haugan*, 543 U.S. 194 (2004), the Supreme Court reiterated:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. *Saucier v. Katz*, 533 U.S., at 206 (qualified immunity operates 'to protect officers from the

40

sometimes "hazy border between excessive and acceptable force"'). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' *Id.*, at 201. As we previously said in this very context:

> '[T]here is no doubt that *Graham v. Connor, supra*, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, that is not enough. Rather, we emphasized in *Anderson* [*v. Creighton*] "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.' ... The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' ...

The Court of Appeals acknowledged this statement of law, but then proceeded to find fair warning in the general tests set out in *Graham* and *Garner* ... In so doing, it was mistaken. *Graham* and *Garner,* following the lead of the Fourth Amendment's text, are cast at a high level of generality. See *Graham v. Connor*, *supra*, at 396 ('"[T]he test of

41

> reasonableness under the Fourth Amendment is
> not capable of precise definition or
> mechanical application"'). Of course, in an
> obvious case, these standards can 'clearly
> establish' the answer, even without a body of
> relevant case law.'

543 U.S. at 198-199. However, as explained in *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir.2003), *cert. denied sub nom. Scarrot v. Wilkins*, 543 U.S. 811 (2004):

> Where the officers' entitlement to qualified
> immunity depends on the resolution of
> disputed issues of fact in their favor, and
> against the non-moving party, summary
> judgment is not appropriate. *See Saucier*,
> 533 U.S. at 216 ... (Ginsberg, J.,
> concurring)('Of course, if an excessive force
> claim turns on which of two conflicting
> stories best captures what happened on the
> street, *Graham* will not permit summary
> judgment in favor of the defendant
> official.').

It is clearly established that a parent has a constitutionally protected interest in the custody or care of his or her children. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Woodrum v. Woodward County, Okla.,* 866 F.2d 1121, 1124-1125 (9th Cir.1989). However, it is also clear that this interest is not absolute. In an emergency situation, a state agency may remove children from their parents' custody when the children are subject to immediate or apparent danger or harm. *Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir.1981). In *Caldwell,* the Ninth Circuit affirmed the District Court's dismissal of an action against social workers brought by a father whose children were removed from his home and sent out of state to the mother, with whom the father shared joint custody:

42

> Caldwell asserts he had a right to a post-deprivation hearing in Montana to determine whether an emergency justified transporting the children to their mother in Washington, who shared legal custody. There are some decisions recognizing that a parent may have a cognizable due process right to a post-deprivation hearing when the state removes a child from the parent's custody and places the child with an individual who does not enjoy legal custody ... However, assuming such a right was clearly established in April 1987, we do not think it vitiates the application of qualified immunity here. This is because Caldwell's children were not placed with a person who lacked legal custody rights. Indeed, there is no dispute that the policy being followed by Farnsworth and Francetich was one limited to situations in which the receiving parent had joint custody. Moreover, defendants aptly point out that the decision as to whether the best interests of the children lay in continuing custody with their father may be best left in the hands of the Washington court, which issued the custody decree. Generally, once a court takes jurisdiction over children and enters a custody decreed, that court retains jurisdiction over custody issues after the children leave that jurisdiction.

Defendants assert that the Fifth Amended Complaint shows that Plaintiff is seeking relief for the actions of Defendants in initiating the ex parte hearing, which Plaintiff attended with counsel and that the charge of kidnaping would have justified the intervention into parental rights.

Plaintiff responds that Defendants misread the allegations of the Fifth Amended Complaint:

> Clarke *has not* ... sought relief on the ground that the defendants *initiated* an ex parte hearing; rather that, because of the defendants' actions, no hearing was held in a timely fashion, and no hearing was provided at which Clarke could be heard, could

43

> confront the evidence against him and present
> timely evidence in opposition.  As set out in
> Clarke's complaint, no such hearing was
> available to him; he was prevented from
> having such an opportunity based on
> defendants' actions: fraud, perjury and *ex
> parte* contact with the court, improper
> withholding of evidence exculpating Clarke,
> submission of perjured and fraudulent
> evidence inculpating Clarke, and false
> evidence exculpating Clarke's former spouse.

Defendants reply that Plaintiff refuses to acknowledge that a hearing took place on the ex parte application on September 16, 2005, even though it is discussed at ¶ 40 of the Fifth Amended Complaint.  Plaintiff was represented by counsel at this hearing. Paragraph 44 of the Fifth Amended Complaint reflects that a subsequent hearing took place on October 11, 2005.  Defendants contend that Plaintiff's real complaint is that the social workers put the matter before the Court and the Madera County Superior Court judge took his custodial rights away or that he believes he was denied due process at those hearings because the judge did not permit Plaintiff to present the evidence Plaintiff wished to present.  Defendants contend that Plaintiff's proper remedy was to appeal the order to the California Courts and "not to pursue a collateral claim in the guise of [a] Section 1983 action."  Defendants further argue that the allegations of the Fifth Amended Complaint indicate the kind of situation in which qualified immunity should apply:

> Plaintiff alleges that a report was made to
> the Police that Plaintiff suspected child
> abuse, and Plaintiff was allegedly told by
> the police not to take the child to the
> exchange.  He indicated to Defendant Upton

and the Department of Social Services that he would not be returning Ambroise. While Plaintiff feels this was justified, the social workers were put in a position between two different parent's rights. The mother's custodial rights were possibly being infringed upon when the child was not returned to her at the appointed time. There has been no finding of fact that the Plaintiff's suspicion of abuse was valid. When there are no certainties as between which parent should have custody under the circumstances, the Defendants should enjoy qualified immunity relative to their actions in managing minor child's care.

Plaintiff admits that the minor child was turned over at the police station where the officers involved in the investigation were stationed, and that the officers had conversations with Defendant Upton. This is not a situation where the facts were clear, and that the officers and the social workers had a substantial certainty has [sic] to which parent should be given immediate custody. By failing to deliver the minor child to the place of exchange at the appointed time, Plaintiff was in arguably disobeying the court's order regarding the exchanges, and he was no longer the parent who should have the child. The question here, though, is not whether Plaintiff was justified in maintaining custody past the point of exchange, but whether his right to custody was certain at the time he turned over the minor child to Defendant Upton. The allegations show that it was not, and the court can find that the qualified immunity applies.

Although Defendants' contentions may be well-taken, under *Gammie*, Defendants' motion to dismiss on the ground of qualified immunity is DEFERRED pending limited discovery.

F. <u>FIFTH, SIXTH AND SEVENTH CAUSES OF ACTION</u>.

Defendants move to dismiss the Fifth, Sixth and Seventh Causes of Action on the ground that the May 9 Decision limited

the leave to amend granted Plaintiff.  The May 9 Decision stated:

> As discussed above, Plaintiff is given leave
> to amend to include the allegations described
> at the hearing concerning the exceptions to
> *DeShaney* with the proviso that Plaintiff,
> proceeding *in pro per*, cannot represent his
> minor son in this action and cannot allege
> violations of his son's constitutional
> rights.  *See discussion infra.*

> Plaintiff's opposition to the motion to
> dismiss asserts that the FAC "properly
> asserts causes of action for ... violations
> of Title 18 U.S.C. Section 242 and 18 U.S.C.
> 245, Discrimination, Title 18 U.S.C. Section
> 1001, Fraud and False Statements, Title, 42
> U.S.C. Section 14141 ... and violations of
> the California Family Code Section 3027.5."

> The FAC contains no such claims or causes of
> action; all of these references are in
> Plaintiff's opposition to the motion to
> dismiss.

> Plaintiff is not given leave to amend to
> allege claims based on violations of Title
> 18, United States Code.  "These criminal
> provisions ... provide no basis for civil
> liability."  *Aldabe v. Aldabe*, 616 F.2d 1089,
> 1092 (9th Cir.1980).

> Plaintiff is not given leave to amend to
> allege claims based on 42 U.S.C. § 14141.
> Section 14141 provides:

>> (a) Unlawful conduct

>> It shall be unlawful for any
>> governmental authority, or any
>> agent thereof, or any person acting
>> on behalf of a governmental
>> authority, to engage in a pattern
>> or practice of conduct by law
>> enforcement officers or by
>> officials or employees of any
>> governmental agency with
>> responsibility for the
>> administration of juvenile justice
>> or the incarceration of juveniles
>> that deprives persons of rights,

privileges, or immunities secured or protected by the Constitution or laws of the United States.

(b) Civil Action by Attorney General

Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1) [sic] has occurred, the Attorney General, or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

This statute, by its terms, does not apply to Plaintiff's claims. Plaintiff is not a juvenile, no administration of juvenile justice or incarceration of a juvenile is involved in this action. Further, the statute does not provide a private right of action.

With regard to Plaintiff's reference to California Family Code § 3027.5, this statute provides:

(a) No parent shall be placed on supervised visitation, or be denied custody of or visitation with his or her child, and no custody or visitation rights shall be limited, solely because the parent (1) lawfully reported suspected sexual abuse of the child, (2) otherwise acted lawfully, based on a reasonable belief, to determine if his or her child was the victim of child abuse, or (3) sought treatment for the child from a licensed mental health professional for suspected sexual abuse.

(b) The court may order supervised visitation or limit a parent's custody or visitation if the court finds substantial evidence that the parent, with the intent to interfere with the other parent's

47

lawful contact with the child, made
a report of child sexual abuse,
during a child custody proceeding
or at any other time, that he or
she knew was false at the time it
was made.  Any limitation of
custody or visitation, including an
order for supervised visitation,
pursuant to this subdivision, or
any statute regarding the making of
a false child abuse report, shall
be imposted only after the court
has determined that the limitation
is necessary to protect the health,
safety, and welfare of the child,
and the court has considered the
state's policy of assuring that
children have frequent and
continuing contact with both
parents as declared in subdivision
(b) of Section 3020.

Although no case discussing Section 3027.5
was located, it does not appear to provide
for a private right of action in federal
court. The statute regulates the granting of
custody and visitation rights by the state
court.  Plaintiff's only reference in his
opposition to Section 3027.5 is in his
discussion of qualified immunity under
Section 1983.  If Plaintiff believes that the
state court improperly limited his custody
and/or visitation rights under Section
3027.5, his remedy is appeal to the
California appellate courts.  Leave to amend
to allege a violation of Section 3027.5 is
denied as futile.

Defendants argue that Plaintiff's inclusion in the Fifth

Amended Complaint of the Fifth, Sixth and Seventh Causes of

Action violates Rule 15(a) because Plaintiff did not seek leave

to include these claims for relief before filing the Fifth

Amended Complaint.

Plaintiff concedes that inclusion of these causes of action

may have been in violation of the May 9 Decision but asserts that

48

his concurrent motion for leave to amend should be granted to overcome this possible objection.

Defendants' motion to dismiss the Fifth, Sixth and Seventh Causes of Action is DENIED.

Plaintiff, who was proceeding *in pro per*, alleged in the Fourth Amended Complaint that Defendants' actions were motivated by bias against Plaintiff because of his Native American ancestry and because Plaintiff is male.  Implicit in these allegations are claims for relief under 42 U.S.C. §§ 1985(3) and 1986. Plaintiff's counsel, in the Fifth Amended Complaint, now explicitly alleges this bias under the governing statutes. Plaintiff's Fourth Amended Complaint contained allegations sufficient to allege *Monell* liability.  The Seventh Cause of Action now explicitly alleges *Monell* liability against the County in a separate cause of action.  Plaintiff has not violated the May 9 Decision and Defendants' contentions are without merit.

G.  <u>PUNITIVE DAMAGES</u>.

Although the Fifth Amended Complaint does not pray for punitive damages, Paragraph 78 of the Third Cause of Action for Intentional Infliction of Emotional Distress and Paragraph 86 of the Fourth Cause of Action for Negligent Infliction of Emotional Distress, allege: "The acts of defendants ... were willful, wanton, malicious and oppressive, and justify the award of exemplary and punitive damages."

In the May 9 Decision, the Court granted Defendants County of Madera and County of Madera Department of Social Services

49

motion to strike the prayer for punitive damages against them, citing *City of Newport v. Fact Concerts*, 453 U.S. 247 (1981); California Government Code § 818.

Defendants argue that the allegations in the Fifth Amended Complaint that Defendants' acts justify the award of punitive damages is effectively a prayer for such damages and should be struck from the pleadings relative to the County of Madera and the Department of Social Services.

Although Plaintiff does not respond to this aspect of Defendants' motion, the motion to strike is DENIED. The parties are aware that, as a matter of law, punitive damages are not available against the County and the Department of Social Services; the allegations pertain only to Defendants Williams and Upton.

## CONCLUSION

For the reasons stated:

1. Defendants' motion to dismiss the Fifth Amended Complaint is GRANTED IN PART WITH PREJUDICE AND DENIED IN PART;

2. Plaintiff's motion for leave to file a Sixth Amended Complaint is granted;

3. Plaintiff shall file a Sixth Amended Complaint within 20 days of the filing date of this Memorandum Decision and Order. IT IS SO ORDERED.

Dated: __May 26, 2009__        _____/s/ Oliver W. Wanger_____
                                UNITED STATES DISTRICT JUDGE